## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GORDON ROY PARKER** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 25-1493** |
| | : | |
| **PANPHIL REALTY, LLC,** | : | |
| **GREENZANG PROPERTIES III, NEW** | : | |
| **HORIZONS WEST I, LP, 2045** | : | |
| **WALNUT STREET ASSOCIATES,** | : | |
| **LLC, AMC DELANCEY GROUP,** | : | |
| **INC., BRITTNEY KNOX, ZILLOW** | : | |
| **GROUP, INC., NANXING WEI, ADAM** | : | |
| **BARSKY** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                              **May 19, 2025**

   A serial pro se litigant invokes this Court's limited subject matter jurisdiction claiming apartment owners in March 2025 violated the Fair Housing Act by requiring a minimum credit score as a requirement for leasing an apartment. He claims unidentified disabled persons could have lower credit scores. And then concludes the apartment owners discriminate against unpleaded disabled persons. He also sues one of the apartment owners and its lawyer for retaliation under the Fair Housing Act because the lawyer emailed him to stop writing directly to the apartment owner who the serial litigant knew to be represented due to filings in this case. But the serial litigant does not plead his disability or his disqualifying credit score. He never pleads he applied for an apartment. So, what is his case or controversy required to sue in federal court? He lacks standing in his own right. He does plead standing based on the futility of applying to rent an apartment. He does not plead standing as a "tester." We grant the serial pro se litigant one last leave (his third try) to plead standing sufficient to invoke our limited subject matter jurisdiction.

I.  **Alleged pro se facts**

Philadelphian Gordon Ray Parker looked at apartments for rent in Philadelphia on the Zillow real estate website in early March 2025.[1] AMC Delancey Group, Inc. placed an advertisement on Zillow's website for a rental property at 4715 Walnut Street, Philadelphia requiring a minimum credit score of 650.[2] Greenzang Properties III placed an advertisement on Zillow for the rental of an apartment at 503 South 41t Street, Philadelphia, which did not specify a minimum credit score but which, in response to Mr. Parker's email inquiry, provided him with a list of twenty-one properties with a minimum credit score for each listing.[3] 2045 Walnut Street Associates LLC placed an advertisement on Zillow for rental property at 2045 Walnut Street, Philadelphia requiring a minimum credit score of 675.[4] Brittney Knox, on behalf of New Horizons West I, LP, responded to Mr. Parker's email inquiry about a property located at 4101 Baltimore Avenue, Philadelphia.[5] Ms. Knox confirmed New Horizons West required a minimum credit score of 625 and no earlier evictions to apply, despite the property being designated by the City's Department of Licenses and Inspections as "unsafe."[6]

Mr. Parker turned around and sued these apartment owners eleven days later claiming their credit score notices violated the Fair Housing Act and Philadelphia's Renters' Access Act.[7] The apartment owners retained Adam Barsky, Esquire who promptly moved to dismiss.[8]

Mr. Parker responded to Attorney Barsky's motion by moving for a preliminary injunction five days later without showing service upon Attorney Barsky as the apartment owners' disclosed counsel of record.[9] Mr. Parker then knew Attorney Barsky represented the apartment owners. He nevertheless ignored the fact of Attorney Barsky's representation and later contacted AMC Delancey regarding an advertisement for rental apartments at Verona Plaza around April 17, 2025.[10] AMC Delaney responded to Mr. Parker's inquiry by advising him of a required credit score

of 650 and other requirements.[11] Mr. Parker responded to AMC Delaney and its agent Ms. Oliver with an accusation the "ad violated both the Fair Housing Act and Renters Access Act" and advised Agent Oliver of his lawsuit against Zillow and AMC Delancey.[12] Attorney Barsky then emailed Mr. Parker asking he "cease and desist from contacting the defendants" under "R. 4.2," putting him "officially on notice."[13]

Mr. Parker then amended his complaint to add Attorney Barsky and AMC Delaney for retaliation under the Fair Housing Act.[14] Acting as a self-appointed private attorney general, Mr. Parker sued the apartment owners, their agents, and Zillow claiming this credit score requirement violates the Fair Housing Act and Philadelphia's Renters' Access Act. He alleges the existence of a credit score requirement "deterred" him from submitting a rental application because doing so "would be futile," the application fees are prohibitive and would harm his credit score, making it more difficult for him to rent, and would "force him to rent from hostile landlords with extensive control over tenant privacy and living conditions."[15] Mr. Parker did not advise any of the apartment owners, managers, or agents of a disability nor request a reasonable accommodation regarding a low credit score occasioned by a disability. He does not allege a disability, pleading only he is "a disabled individual."[16]

He also now sues Attorney Barsky and AMC Delancey in the amended Complaint for retaliation under the Fair Housing Act because of Attorney Barsky's email directing him to communicate with Attorney Barsky and not the client apartment owners.

## II.    Analysis

The apartment owners, their agents, and Attorney Barsky move to dismiss the amended Complaint arguing Mr. Parker lacks standing and does not plead (1) a discrimination claim under the Fair Housing Act; (2) a retaliation claim under the Fair Housing Act against Attorney Barsky

and AMC Delancey Group, Inc.; (4) a supplemental state law claim under Philadelphia's Renters' Access Act; (5) claims for declaratory and injunctive relief; and (6) claims against the apartment owners' lawyer Attorney Barsky.[17]

Mr. Parker opposes the relief conceding he has not applied to rent an apartment but he can proceed on behalf of others as a "private attorney general" and "nuisance" because it is futile for him to apply for a rental and he can otherwise proceed as a "tester" on behalf of disabled persons who may have lower credit scores.[18] We grant the motion to dismiss as there is no plausible basis to find a federal claim. We grant Mr. Parker one last leave to amend if he can plead an identified disability led the apartment owners to deny him a rental apartment for which he admittedly did not apply. We decline to exercise supplemental jurisdiction over the Philadelphia Code claims which Mr. Parker may timely pursue in state court if he does not seek to further pursue his federal claims in this Court. And he must address all communications to counsel for the represented parties.

### A.  Mr. Parker lacks Article III standing.

Congress through the Fair Housing Act prohibits discrimination "in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of" the buyer or renter.[19] Congress also prohibits "interference, coercion, or intimidation" with "any person in the exercise or enjoyment or, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by" the Act.[20]

Congress allows for a private right of action by allowing "[a]n aggrieved person" to challenge an "alleged discriminatory housing practice."[21] The Act defines an "aggrieved person" as "any person who – (1) claims to have been injured by a discriminatory housing practice; or (2)

4

believes that such person will be injured by a discriminatory housing practice that is about to occur."[22]

The Framers through Article III of the Constitution, limited federal judicial power to "Cases" and "Controversies."[23] A "case or controversy can exist only if a plaintiff has standing to sue," described recently by the Supreme Court as "a bedrock constitutional requirement that this Court has applied to all manner of important disputes."[24] Standing to sue under the Fair Housing Act is broad as Article III's "minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered 'a distinct and palpable injury.'"[25]

Standing is necessary for our jurisdiction and a motion to dismiss challenging the exercise of our jurisdiction based on standing is analyzed under Federal Rule of Civil Procedure 12(b)(1).[26] We evaluate whether a complaint adequately pleads the elements of standing by applying the Rule 12(b)(6) standard; we must accept as true all material allegations of the complaint and construe the facts in favor of the nonmoving party.[27] Mr. Parker must plead sufficient factual matter, accepted as true, to state a claim that is plausible on its face.[28]

To establish standing, Mr. Parker must demonstrate: (1) he "has suffered or likely will suffer an injury in fact"; (2) "the injury likely was caused or will be caused by the defendant"; and (3) "the injury likely would be redressed by the requested judicial relief."[29] The "two key questions in most standing disputes are injury in fact and causation."[30]

The injury in fact requirement "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular" action and "prevents the federal courts from becoming a 'vehicle for the vindication of the value interests of concerned bystanders.'"[31] "[I]njury-in-fact must be 'concrete, particularized, and actual or imminent.'"[32] "A concrete injury is real rather than abstract, and a particularized injury is one that affects the plaintiff in a personal

and individual way."[33] Injury cannot be "conjectural or hypothetical" and standing cannot be established by "asserting an abstract general interest common to all members of the public ... no matter how sincere or deeply committed a plaintiff is to vindicating that general interest on behalf of the public."[34]

A plaintiff must also show his injury "likely was caused or likely will be caused by the defendant's conduct" to meet the causation element for standing.[35] Mr. Parker, as the plaintiff, carries the burden of establishing standing at the time he brought his lawsuit and must establish standing for each claim he asserts.[36]

The apartment owners focus on the injury-in-fact element of standing, arguing Mr. Parker did not submit a rental application to any rental agency, he only saw the credit score requirements on Zillow or sent emails making a general inquiry into credit scores, and Defendants never rejected a rental application.[37] The apartment owners further argue if they had received an application from Mr. Parker and learned of his disability, they would have had an opportunity to present reasonable accommodations to him to lower the barriers to housing but, without an application, they could not accommodate. And they argue it is not per se unlawful for rental agencies to publish credit score requirements as a discretionary factor in approving rental applications.

Mr. Parker does not argue he applied for an apartment and the apartment owners denied him.  He instead responds with two theories: applying for an apartment would be futile, which grants him Article III standing, and he enjoys standing as a "tester" under the Supreme Court's 1982 decision in *Havens Realty Corp. v. Coleman*.[38] Mr. Parker's standing arguments require some unpacking to demonstrate their faulty premise.

**1.  Mr. Parker has not plead futility sufficient to establish standing.**

The Supreme Court nearly fifty years ago held—in the context of alleged unlawful race-based employment practices—"[w]hen a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an [employment] application."[39] In *International Brotherhood of Teamsters v. United States*, the United States sued an employer and union alleging a seniority system discriminated against Black and Spanish-surnamed employees in favor of White employees in violation of Title VII. The Court rejected the employer's argument an employee who did not apply for a job cannot be awarded seniority relief.[40] The Court analogized the employer's policy of discrimination to an overt sign on the "hiring-office door" reading "Whites Only," finding the employer's "victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs."[41]

Mr. Parker relies on *Teamsters* for the proposition he need not have submitted a rental application to establish standing. The Court did not decide *Teamsters* within the context of standing. The Court revisited *Teamsters* in 2020. In *Carney v. Adams*, a Delaware lawyer sued Delaware's Governor challenging a Delaware constitutional provision requiring appointments to Delaware's courts reflect a partisan balance.[42] The lawyer, a registered Independent, argued the partisan balance requirement violated his First Amendment right to freedom of association by making him ineligible to become a judge unless he joined one of the two major political parties. The Delaware Governor challenged the attorney's standing at the summary judgment stage. Judge Thynge held the lawyer enjoyed standing and our Court of Appeals affirmed. But the Supreme Court reversed, finding the lawyer did not show Delaware's major party provision caused him concrete, particularized injury-in-fact "over and above the abstract generalized grievance suffered

by all citizens of Delaware who (if [the lawyer] is right) must live in a State subject to an unconstitutional judicial selection criterion."[43] The Court recognized its "futile gesture" holding in *Teamsters*, explained it is not departing from it, but rather applying in the context of the facts the lawyer's failure to show he was "able and ready" to apply to run for judge in the imminent future.[44]

Our Court of Appeals applied the Supreme Court's guidance in *Carney* at the motion to dismiss stage four years ago.[45] In *Ellison*, an orthopedic surgeon from California planned to move to New Jersey and sought medical staff privileges at three New Jersey hospitals. The New Jersey hospitals required physicians to successfully complete a multi-step certification exam. The surgeon passed the first step, but the certifying entity prohibited him from taking the second step of the exam until he obtained medical staff privileges at a hospital. The surgeon did not apply for staff privileges and instead sued the certifying entity for anti-competitive conduct.

The certifying entity moved to dismiss for lack of standing. Judge McNulty dismissed the claim, the surgeon appealed, and our Court of Appeals affirmed the dismissal. Our Court of Appeals reasoned the surgeon lacked injury-in-fact because the surgeon did not have particularized injury.[46] The court identified two principles to consider when assessing injury-in-fact: first, citing the Supreme Court's analysis a year earlier in *Carney*, the failure to apply for a benefit does not preclude standing if application would be futile; and second, where a plaintiff alleges a denial of a benefit or opportunity for which he did not actually apply, he must "generally plead enough facts" to show *Carney's* "able and ready to apply" metric.[47]

Our Court of Appeals explained the futility principle: "simply declaring that applying would be futile does not necessarily establish standing, either."[48] "A plaintiff who claims that he was deterred from applying for a benefit by wrongful practices bears the 'burden of proving that

he would have applied ... had it not been for those practices,' as '[t]he known prospect of [wrongful] rejection shows only that [individuals] who wanted [benefits] may have been deterred from applying for them. It does not show which of the nonapplicants actually wanted such [benefits], or which possessed the requisite qualifications.'"[49] With regard to the "able and ready to apply" principle, our Court of Appeals explained while it is not a high bar, a plaintiff must plead enough facts to show "a direct stake in the outcome of a litigation," rather than a "mere interest in the problem."[50]

We now assess Mr. Parker's conclusory allegations mindful of this guidance from the Supreme Court and our Court of Appeals. He does not sufficiently allege futility and does not allege enough facts to show he is "able and ready" to apply for rental apartments but for the apartment owners' credit score requirements deterring him. Mr. Parker only alleges he went on the Zillow website looking for rental apartments, some rental agencies listed minimum credit scores; he made inquiries to the rental agencies not listing a minimum credit score; he has some unpleaded disability; unidentified apartment owners' application fees are prohibitive; credit score policies in general—but not application fees—disproportionately exclude disabled persons; and one or more persons " deterred" him from applying for a rental property.[51] Mr. Parker does not plead he took meaningful action or "actual steps that demonstrate a real interest in seeking" a rental property without having to meet a minimum credit score allegedly discriminatory against disabled persons.[52] We dismiss Mr. Parker's amended Complaint for lack of standing.

### 2. Mr. Parker does not plead "tester" standing.

We next turn to Mr. Parker's argument he has standing as a "tester" under the Supreme Court's 1982 decision in *Havens Realty.* "Testers" are "individuals who, without an intent to rent

or purchase a home or apartment, pose as renters or purchasers for the purpose of collective evidence of unlawful steering practices" in violation of the Fair Housing Act.[53]

In *Havens Realty*, the owner of an apartment complex told a Black tester no apartments were available but told a White tester apartments were available.[54] The Black testers alleged the apartment owner gave them misinformation causing "specific injury."[55] The Supreme Court held the "testers"—who did not have an intent to rent an apartment but posed as renters for the purpose of collecting evidence of unlawful steering practices—had standing under the language of the Fair Housing Act.[56] Congress through section 3604(d) of the Act makes it unlawful "[t]o represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available."[57] Congress, through the Act, conferred on all "persons" a legal right to truthful information about available housing thus affording the testers standing to sue.[58] And because the landlord denied Black testers truthful information, a right ensured by the Act, the testers had standing.

We have a different set of facts. Mr. Parker alleges apartment owners violated section 3604(f)(1) of the Act through which Congress makes unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap ...."[59] Mr. Parker does not allege an apartment owner discriminated in the sale or rental, or "otherwise ma[d]e unavailable or den[ied]" a dwelling to Mr. Parker. The allegation is simply a communication by apartment owners in their online Zillow postings and in response to Mr. Parker's inquiries they consider a minimum credit score. As currently pleaded, the apartment owners did not deny or "otherwise make unavailable" a rental property because of a handicap. This

makes him different than the "testers" found to have standing in *Havens Realty*. We dismiss Mr. Parker's claims under the Fair Housing Act for lack of standing under a "tester" theory.

Mr. Parker did not meet his burden of establishing standing at the time he brought his complaint.[60] We have "'an obligation to assure ourselves' of litigants' standing under Article III" before proceeding to the merits of a case.[61] There is no standing as currently pleaded so we will not address the merits of Mr. Parker's disability discrimination claims and retaliation claim against Attorney Barsky and AMC Delancey Group.[62]

### B.  We decline to exercise supplemental jurisdiction.

We lack jurisdiction without a plausible allegation of Mr. Parker's standing to bring Fair Housing Act claims. We may decline to exercise supplemental jurisdiction under section 1367(c)(3) when we dismiss all claims over which we have original jurisdiction.[63] With no jurisdiction over Mr. Parker's federal claims, we decline to exercise jurisdiction over Mr. Parker's supplemental state law claim asserted under Philadelphia Code § 9-810.[64]

## III.  Conclusion

We grant Defendants' Motion to dismiss without prejudice to Mr. Parker filing a second amended Complaint if he can do so consistent with Federal Rule of Civil Procedure 11 and governing law.

---

[1] ECF 13, ¶ ¶ 1, 7.

[2] ECF 13 ¶ 11.

[3] *Id.* ¶ 12. Mr. Parker included a screen shot of the email he received from Greenzang Properties which purports to state Greenzang Properties "looks for credit over 670 for each applicant and proof of income 3x the rent. If you do not have any credit income or are between 620-670, we may consider a co-signer with good credit. Applicants with credit under 600 are typically not considered for approval for the apartments listed below." *Id.*

[4] *Id.* ¶ 13.

[5] *Id.* ¶ 14.

[6] *Id.* Mr. Parker also alleges Ms. Wei, agent for PanPhil Realty (neither of whom have been served) placed an advertisement on Zillow for rental of a property at 425 North 41st Street, Philadelphia, limiting the property to one occupant and minimum credit score of 650. *Id.* ¶ 15.

[7] Fair Housing Act, 42 U.S.C. § 3601, *et seq.*; Phila. Code, Title 9, § 9-810. Mr. Parker now sues PanPhil Realty, LLC; AMC Delancey Group, Inc.; Greenzang Properties III; 2045 Walnut Street Associates, LLC; New Horizons West I, LP; individuals Nanxing "Nancy" Wei and Brittney Knox; attorney Adam Barsky, Esq; and Zillow Group, Inc. ECF 13.

A review of the docket confirms Mr. Parker has not effected service of a summons and complaint upon PanPhil Realty, LLC and its alleged agent Ms.. Zillow Group, Inc. waived service of the original Complaint on March 27, 2025. ECF 7.

It appears the correct name of "New Horizons West I, LP" is "New Horizons West I, LP d/b/a New Horizon Housing" and the correct name of "Greenzang Properties III" is "Greenzang Properties, LLC." Mr. Parker may correct the names in a second amended Complaint if he proceeds.

[8] ECF 5.

[9] ECF 9.

[10] *Id.* ¶ 16.

[11] *Id.* ¶ 16.a.

[12] *Id.* ¶ 16.b.

[13] *Id.* ¶ 16.c. Although unspecified in Attorney Barsky's email, we assume he refers to the Model Rule of Professional Conduct 4.2 prohibiting lawyers from communicating with other persons the lawyer knows to be represented by counsel in the matter. Mr. Parker does not believe Rule 4.2 applies to him because he is not an attorney. *Id.* Mr. Parker does not address the Notice of Guidelines for appearing pro se sent to him by our Clerk of Court requiring, among other things, pro se litigants to conduct all litigation "respectfully by all parties before the Court" and required "when dealing with opposing counsel, with the Court, and with the Clerk's Officer in all verbal and written communications." ECF 3.

[14] ECF 13.  Mr. Parker has filed twenty-one pro se lawsuits since 2002 at Nos. 02-567, 02-7215, 03-6936, 04-3918, 05-2752, 05-4874, 05-157, 07-2757, 08-829, 08-3630, 15-3304, 15-3337, 15-3453, 15-6065, 16-2710, 16-4786, 17-2540, 17-2675, 23-3999, 24-2279, and today's case at 25-1493.

[15] *Id.* ¶ 18.

[16] *Id.* ¶ 21.

[17] Attorney Barsky moved to dismiss the amended Complaint on behalf of himself, Ms. Knox, New Horizons West I, LP d/b/a New Horizon Housing, AMC Delancey Group, Inc., Greenzang Properties, LLC, and 2045 Walnut Street Associates, LLC. ECF 17.

[18] ECF 20.

[19] 42 U.S.C. § 3604(f)(1).

[20] *Id.* § 3617.

[21] *Id.* § 3613(a)(1)(A).

[22] *Id.* § 3602(i).

[23] *United States v. Texas*, 599 U.S. 670, 675 (2023). The Framers in Section 2 of Article III provided: "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;--to all Cases affecting Ambassadors, other public Ministers and Consuls;--to all Cases of admiralty and maritime Jurisdiction;--to Controversies to which the United States shall be a Party;--to Controversies between two or more States;--between a State and Citizens of another State;--between Citizens of different States,--between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects." U.S. CONST. art. III, § 2.

[24] *Texas*, 590 U.S. at 675 (collecting cases).

[25] *Fair Housing Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 75 (3d Cir. 1998) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982)).

[26] *Huertas v. Bayer US LLC*, 120 F.4th 1169, 1174 (3d Cir. 2024) (quoting *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007)).

[27] *Id.* (quoting *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012) (footnote omitted)).

[28] *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[29] *Food & Drug Admin. v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 380 (2024).

[30] *Id.* at 381 (footnote omitted).

[31] *Id.* at 381-82 (quoting *Allen v. Wright*, 468 U.S. 737, 756 (1984)).

[32] *AstraZeneca Pharm. LP v. Sec'y U.S. Dep't of Health & Human Servs.*, --- F.4th  --, No. 24-1819, 2025 WL 1338088, at *4 (3d Cir. May 8, 2025) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).

[33] *Id.* (quoting *Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 205 (3d Cir. 2021)).

[34] *Carney v. Adams*, 592 U.S. 53, 58-59 (2020) (internal citations omitted).

[35] *Alliance for Hippocratic Medicine*, 602 U.S. at 382.

[36] *Carney*, 592 U.S. at 59.

[37] ECF 17-2 at 3.

[38] 455 U.S. 363 (1982).

[39] *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365-66 (1977).

[40] *Id.* at 365.

[41] *Id.*

[42] 592 U.S. 53 (2020).

[43] *Id.* at 59.

[44] *Id.* at 66.

[45] *Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200 (3d Cir. 2021).

[46] *Id.* at 205-06.

[47] *Id.* at 206 (internal quotations omitted) (quoting *Carney*, 592 U.S. at 60). Our Court of Appeals noted the "able and ready" standard typically applies to equal protection claims but is not limited to equal protection claims. *Id.* at n.3. "The standard's applicability turns not on the right that a plaintiff asserts, but on the nature of the injury that the plaintiff alleges." *Id.* (citations omitted).

[48] *Id.* at 206.

[49] *Id.* (quoting *Teamsters*, 431 U.S. at 368–69).

[50] *Id.* at 206-07 (citations omitted).

[51] ECF 13 ¶¶ 11-16, 18, 20, 21.

[52] *Ellison*, 11 F. 4th at 207.

[53] *Havens Realty Corp.*, 455 U.S. at 373.

[54] *Id.* at 368.

[55] *Id.* at 369.

[56] *Id.* at 373.

[57] 42 U.S.C. § 3604(d).

[58] *Havens Realty Corp.*, 455 U.S. at 373.

[59] 42 U.S.C. § 3604(f)(1).

[60] *Carney*, 592 U.S. at 59.

[61] *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006) (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)).

[62] To proceed on a retaliation claim under the Fair Housing Act, Mr. Parker must allege "(1) [he] is a protected individual under the FHA, (2) [he] was engaged in the exercise or enjoyment of [his] fair housing rights, (3) the defendants coerced, threatened, intimidated, or interfered with the plaintiff on account of [his] protected activity under the FHA, and (4) the defendants were motivated by an intent to discriminate." *El v. People's Emergency Ctr.*, 315 F.Supp.3d 837, 842 (E.D. Pa. 2018) (citing *Bloch v. Frischholz*, 587 F.3d 771, 783 (7th Cir. 2009)). Attorney Barsky and AMC Delancey Group argue Mr. Parker does not plead protected activity or adverse action. The Department of Housing and Urban Development's regulations define unlawful conduct under the retaliation section of the Fair Housing Act. Unlawful activity includes: (1) "[r]etaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act," ... and (2) "[r]etaliating against any person because that person reported a discriminatory housing practice to a housing provider or other authority." *Lloyd v. Presby's Inspired Life*, 251 F. Supp. 3d 891, 904 (E.D. Pa. 2017) (quoting 24 C.F.R. §§ 100.400(c)(5), (c)(6)). Mr. Parker did not allege he made a complaint, testified, assisted, or participated in a proceeding under the Fair Housing Act or reported a discriminatory housing practice to a provider or other authority. Mr. Parker is aware of what constitutes protected activity under the Fair Housing Act as explained to him by Judge Pappert in an earlier case brought by Mr. Parker challenging a landlord's attempt to evict him and his brother. *See Parker v. Lee*, No. 23-3999, 2024 WL 3889092, at *3-*4 (E.D. Pa. Aug. 20, 2024). Mr. Parker then complained to the Philadelphia Commission on Human Relations which Judge Pappert found to be protected activity. We have no such allegation here. Nor do we view Attorney Barsky's email warning Mr. Parker to refrain from communicating directly to his represented clients during litigation as protected activity. The Act requires coercion, intimidation, threats, or interference with a protected right. 42 U.S.C. § 3617. Mr. Parker must do more than conclude Attorney Barsky's email constitutes a threat.

---

[63] *Hunter v. Pa. Dep't of Corrections*, No. 24-3182, 2025 WL 1218252, at *3 (3d Cir. Apr. 28, 2025) (quoting *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 567 (3d Cir. 2017)).

[64] Section 9-810 of the Philadelphia Code prohibits, *inter alia*, "credit exclusions" by "a prospective landlord of any dwelling unit" from "maintain[ing] a policy of automatically declining to rent a dwelling unit to a prospective tenant solely because ... (b) the prospective tenant's credit score or tenant screening score derived, in whole or in part, from a tenant screening report falls below a specific numerical threshold." Phila. Code, Title 9, § 9-810(2).