## IN THE UNITED STATES COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER,** <br><br> Plaintiff <br><br> v. <br><br> Panphil Realty, LLC, et al. <br><br> Defendants | **REC'D MAY 27 2025** <br><br> **Case No: 2:25-cv-01493-RBS** |

## PLAINTIFF'S MOTION FOR RECONSIDERATION OF ORDER DISMISSING CASE

Plaintiff Gordon Roy Parker respectfully moves for reconsideration of the Court's May 19, 2025 Order dismissing this action for lack of standing.

## I.    INTRODUCTION

In doing so, the Court failed to apply the liberal construction standard mandated for pro se litigants and overlooked the complete factual record established across multiple pleadings and filings.[1] This motion addresses the record as it stands; if required to Amend, Plaintiff will introduce evidence more than sufficient to establish standing.

Rather than addressing whether Defendants' conduct violated the Fair Housing Act (FHA) and Philadelphia's Renters' Access Act (RAA), the Court labeled Plaintiff a "serial pro se litigant" and inferred he lacked standing, despite a clear, direct, injury-in-fact to Plaintiff.[2]

---

[1] Third Circuit precedent requires courts to consider all filings together when assessing whether a pro se plaintiff has sufficiently pled a claim. See Lewis v. Att'y Gen., 878 F.2d 714, 722 (3d Cir. 1989); Alston v. Parker, 363 F.3d 229, 234 (3d Cir. 2004); Erickson v. Pardus, 551 U.S. 89, 94 (2007); Haines v. Kerner, 404 U.S. 519, 520–21 (1972). Also, to the extent necessary to first establish the existence of the world prior to seeking relief, *Plaintiff is willing to aver or stipulate that, based on information and belief, the sun will rise* tomorrow morning.

[2] Additionally, the Court's use of the name "*Gordon Ray Parker*"—a formulation that appears almost exclusively in hostile online forums and defamatory contexts—raises serious concern. It suggests the possible influence of non-record, extrajudicial information in shaping the Court's perception of Plaintiff. Combined with the "serial pro se litigant" label, this contributes to an appearance of bias. This mischaracterization risks chilling the very private enforcement mechanisms both statutes depend upon. Absent judicial immunity, these words would trigger an action for trade libel, as Plaintiff is both a high-level paralegal

## II.  **FACTUAL RESPONSE TO DISMISSAL ORDER**

This section responds, paragraph-by-paragraph, to the material factual assertions and legal interpretations in the Court's Memorandum and Order dated May 19, 2025 (ECF 21), dismissing Plaintiff's First Amended Complaint.  Additional evidence will be provided in the Amended Complaint, should the dismissal order not be vacated on reconsideration.

1.    Court Statement (Order, p. 1):

> "A serial pro se litigant invokes this Court's limited subject matter jurisdiction claiming apartment owners in March 2025 violated the Fair Housing Act by requiring a minimum credit score as a requirement for leasing an apartment."

***Response***: Plaintiff does not dispute the number of actions filed over the years. However, such volume is irrelevant to the legal merit of the instant claims. Courts have repeatedly held that pro se status should not prejudice the litigant, especially in the context of civil rights enforcement. Plaintiff has successfully settled or prevailed in several actions, including <u>Parker v. Lee</u>, E.D. Pa. No. 23-3999, in which defense counsel here participated. The invocation of jurisdiction is properly grounded in 28 U.S.C. §§ 1331, 1343, and the Fair Housing Act, 42 U.S.C. § 3601 et seq., which explicitly encourages private enforcement, as does the Renters Access Act, which deserves supplemental jurisdiction.

2.   Court Statement (p. 1):

> "He claims unidentified disabled persons could have lower credit scores... concludes the apartment owners discriminate against unpleaded disabled persons."

***Response***: First and foremost, those "unidentified disabled persons" include ***roommates*** who were also discouraged from seeking housing, which impacts both Plaintiff's ability to reduce costs by taking a

---

and someone who has trained 4GL bots in PAL to perform complex math since 1993, and to generate output with substantial value on the retail market at that time and even now. The AI he used to draft this pleading has passed the Bar Examination.

roommate, and which drives up the cost of low-budget hotels, where many of these disabled persons land, at much greater cost than a shared rental.

Even without the above to establishing an injury-in-fact, Plaintiff did not bring the case on behalf of others. He explicitly alleged in both the First Amended Complaint and his Motion for Preliminary Injunction that he is disabled, with cancer and severe asthma, and that he has a credit score of 575. He has a paid caregiver, his brother, for three hours a day, something well known to Defendant Barsky through his representation of the Lees. Plaintiff further alleged that these conditions materially limit his ability to function, require proximity to hospitals, and constitute a disability under the FHA.

Plaintiff also pled that the minimum credit-score policies disproportionately exclude disabled individuals, and that he was directly deterred from applying due to the risk of financial harm and denial. These injuries are directly tied to his disability and are not abstract; they meet the threshold of injury-in-fact under Article III and establish discriminatory impact under 42 U.S.C. § 3604(f). Credit-score requirements facially neutral on their face, when applied uniformly, have a disparate impact on individuals with disabilities who often have reduced income or medical. By refusing to provide reasonable accommodation, Defendants effectively rendered rental housing unavailable because of his disability. Plaintiff suffered yet another direct injury due to deterrence against potential roommates, thus further impeding his housing search.

3. Court Statement (pp. 2–3):

> "He also sues one of the apartment owners and its lawyer for retaliation under the Fair Housing Act because the lawyer emailed him to stop writing directly to the apartment owner who the serial litigant knew to be represented."

**_Response_**: HUD regulations, recognize threats to sue over discriminatory housing practices as protected activity. See 24 C.F.R. § 100.400(c)(5)-(6); Lloyd v. Presby's Inspired Life, 251 F. Supp. 3d 891, 904 (E.D. Pa. 2017). Defendant Barsky also had knowledge of Plaintiff's protected status as a whistleblower via Parker v. Lee, in which he was defense counsel[3]

---

[3] **_Rule 4.2 of the Rules of Professional Conduct does not apply to pro se litigants_**, and Plaintiff's communications were respectful and lawful. The Clerk's Office Pro Se Guidelines are non-binding and do not bar such contact.

4. Court Statement (pp. 7–8):

> "Mr. Parker relies on Teamsters... [but] the Court did not decide Teamsters within the context of standing... [and] found in Carney... the Supreme Court reversed, finding the lawyer did not show he was 'able and ready' to apply."

*Response*: Teamsters remains foundational to the principle that applicants need not perform futile acts to assert rights. Carney involved a speculative injury in a judicial appointment process; Plaintiff here is actively seeking housing while disabled, facing a known and dated termination of occupancy. He contacted landlords, received firm credit score requirements that he could not meet, and was procedurally barred from applying by being told to go through opposing counsel. That meets the "able and ready" standard.  It should also go without saying, but won't, that one who must apply for a job to have standing need not become a ***vulnerable tenant of a hostile employer/landlord***.

5. Court Statement (p. 9):

> "He does not sufficiently allege futility and does not allege enough facts to show he is 'able and ready' to apply..."

*Response*: Plaintiff pled facts showing immediate housing need, medical urgency, a known credit score below advertised thresholds, and deterrence caused by those thresholds. Application fees, likely rejection, and attorney-mediated communication all show that application would be futile.

6. Court Statement (pp. 10–11):

> "The allegation is simply a communication by apartment owners in their online Zillow postings... As currently pleaded, the apartment owners did not deny or 'otherwise make unavailable' a rental property because of a handicap."

*Response*: Zillow postings and confirming emails from agents serve as tangible evidence of facially discriminatory policies. The listings exclude applicants below 625–675 credit scores. Plaintiff is disabled, meets the profile likely to be harmed by such policies, and was deterred by them. This meets the "otherwise make unavailable" standard under 42 U.S.C. § 3604(f)(1).

7.  Court Statement (p. 12 n.13):

> "Mr. Parker does not address the Notice of Guidelines for appearing pro se..."

***Response***:  Plaintiff's conduct has remained professional and respectful. The guidelines do not prohibit communication with represented parties when the litigant is pro se.

9.  Court Statement (p. 15 n.62):

> "Mr. Parker did not allege he made a complaint...nor do we view Attorney Barsky's email warning Mr. Parker to refrain from communicating directly to his represented clients during litigation as protected activity.."

***Response***: Defendant Barsky's e-mail was retaliatory and not protected activity.  Plaintiff had also filed prior FHA complaints with the Philadelphia Commission on Human Relations and brought prior FHA retaliation claims against the Lees in which Defendant Barsky served as opposing counsel. These constitute protected activity. ***Plaintiff also filed a PCHR complaint against the Defendants in this case.***  Threats to sue over discriminatory advertising also constitute protected activity per HUD and federal precedent. Defendant Barsky's email was not neutral—it sought to suppress protected speech.

## CONCLUSION

Each of these points, taken together, refutes the factual and legal basis of the Court's dismissal and supports reconsideration under Rule 59(e).  The instant motion should therefore be granted.  An appropriate form of order is attached.

This the 27th day of May, 2025.

**Gordon Roy Parker, Pro Se**
315 South Broad Street, #0106
Philadelphia, PA  19107
gordonroyparker@gmail.com
(215) 951-4131

## <u>Table Of Contents</u>

**I.    INTRODUCTION** ...................................................................................1
*Frames the motion for reconsideration. Asserts that the dismissal was rooted in bias and legal misapplication, overlooking pro se standards and statutory enforcement intent.*

**II.   LEGAL STANDARD** ..............................................................................2
*Establishes the controlling law governing pro se pleading, standing, and constitutional housing rights.*

    **A.   Housing As A Constitutional Right** .............................................2
       *Argues housing implicates other constitutional rights (travel, life) warranting strict scrutiny.*

        **1.   Constitutional Injury from Secondary Harm** ...................2
          *Explains that reputational harm (or any regular harm) can rise to constitutional harm when it impacts other fundamental rights like travel or health.  Relies on <u>Paul v. Davis</u>.*

        **2.   Constitutional Interests in Housing and Travel** .............2
          *Assertion that exclusion from housing affects the right to travel.*

        **3.   State Actor/Common Carrier Doctrine** ..........................3
          *Claims landlords function as state actors due to their public regulatory role, making them subject to constitutional constraints.*

    **B.   Standing and the Futility Doctrine** ...........................................3
       *futility precluding the need to apply, damage to potential roommates as injury-in-fact, and a presumption of bad faith (and futility standing) when Defendants violate local laws that confer standing based on advertising.*

    **C.   Protected Activity/FHA Retaliation** .........................................4
       *Argues Plaintiff's threats of legal action and administrative complaints are protected by the FHA; Barsky's email constituted retaliation.  Barsky was counsel in prior whistleblower lawsuit/aware.*

    **D.   Credibility and Prior Bad Acts** .................................................4
       *Cites Defendants' ongoing violations of housing law after the lawsuit as proof of bad faith and bolsters the plausibility of futility.*

    **E.   Liberal Construction of Pro Se Pleadings** ................................5
       *Affirms that courts must read all filings together and interpret them in the light most favorable to pro se litigants.*

    **F.   Disparate Impact** .......................................................................5
       *Shows that credit-score thresholds disproportionately exclude the disabled, triggering FHA liability even without intent.*

**III.  ARGUMENT** .......................................................................................6
*Synthesizes law and facts demonstrating Plaintiff's standing and constitutional stakes.*

    **A.   Plaintiff's Allegations Establish Constitutional Harm** ...........6
       *Argues Plaintiff's disability, health urgency, and housing need threaten his right to life if not met.*

1.  **Paul v. Davis Standard**............................................6
    *Reiterates how loss of housing options connected to protected interests amounts to constitutional harm.*

2.  **Landlords as State Actors**......................................6
    *Expands argument on public functions and regulatory entwinement placing landlords within state actor doctrine.*

3.  **Common Carrier Analogy** ......................................7
    *Argues that landlords' gatekeeping role and reliance on public funding/support equate to common carrier standards.*

B.  **Standing**........................................................7
    *Demonstrates direct and deterrent injuries meet Article III requirements.*

    1.  **Standing Based on Futility**................................7
        *Asserts known credit-score cutoffs deterred Plaintiff from applying, constituting actionable injury.*

    2.  **Standing Based on Direct Injury**...........................8
        *Asserts standing based on three distinct types of direct injury.*

        a.  **Illegal Advertising Deters Plaintiff's Potential Roommates**......................8
            *Asserts standing based on the illegal advertisements depleting the pool of potential roommates for Plaintiff, thus driving up his costs.*

        b.  **Illegal Advertising Drives Up The Cost Of Low-Budget Housing**.............8
            *Asserts standing based the pool of potential roommates for Plaintiff migrating to low-budget temporary lodging, thus driving up his costs.*

        c.  **Disability and Harm Are Directly Tied to the Policy (And The Ad)**.........9
            *Asserts standing based on the advertisement harming Plaintiff*

D.  **Plaintiff Engaged in Protected Activity and Was Retaliated Against**.....................9
    *Argues Plaintiff's conduct qualifies as protected activity and Barsky's legal threats were retaliatory under FHA.*

E.  **Pro Se Status Requires Liberal Construction of Record** ...........................................9
    *Urges the Court to reconsider by aggregating the record as required under liberal pro se standards.*

F.  **Ongoing Violations Undermine Credibility and Reinforce Futility**.......................10
    *Notes Defendants continued illegal advertising after suit, proving no willingness to accommodate.*

IV.  **CONCLUSION**...............................................................10
    *Summarizes basis for reconsideration and requests reinstatement without requiring amendment.*

## **Table Of Points And Authorities**

Carney v. Adams, 592 U.S. 53 (2020)...................................................................................1, 4
*Distinguished—Plaintiff here shows specific life-threatening harm versus generalized grievance.*

Dunn v. Blumstein, 405 U.S. 330 (1972) ...................................................................................3
*Struck down durational residency requirements as unconstitutional; supports right to travel and strict scrutiny of laws burdening it.*

Saenz v. Roe, 526 U.S. 489, 502–03 .....................................................................................1,3
*Held that the right to travel and establish residence is protected by the Constitution; used to support argument that housing access implicates fundamental rights.*

Shapiro v. Thompson, 394 U.S. 618, 629–30 (1969).............................................................1, 3
*Found that conditioning welfare benefits on residency duration violates the Equal Protection Clause; bolsters the travel-right basis for challenging housing exclusion.*

McTernan v. City of York, 577 F.3d 521, 526 (3d Cir. 2009) ..........................................2
*Clarifies de novo standard of appellate review for standing-based dismissals.*

Paul v. Davis, 424 U.S. 693.................................................................................................3, 6
*Majority held that regular harm becomes constitutional harm if it causes secondary constitutional harm.*

Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982) .............................................................4,7
*Established the two-part test for determining when a private party becomes a state actor under the Fourteenth Amendment; used to support the argument that landlords, when operating under and benefiting from state-enforced housing systems, may be subject to constitutional constraints.*

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ............................................................4
*Established the modern test for standing—injury in fact, causation, and redressability.*

Spokeo, Inc. v. Robins, 578 U.S. 330.................................................................................4
*Refines injury-in-fact requirement by distinguishing between procedural and concrete harm.*

Teamsters v. United States, 431 U.S. 324 (1977)................................................................4, 8
*Supports futility doctrine—application not needed when barrier is explicit.*

Ellison v. Am. Bd. of Orthopaedic Surgery, 11 F.4th 200 (3d Cir. 2021) ..............................4, 8
*Clarifies what constitutes "able and ready"—Plaintiff meets this threshold.*

Lloyd v. Presby's Inspired Life, 251 F. Supp. 3d 891 (E.D. Pa. 2017)............................................4
*Establishes that legal threats concerning FHA rights are protected activity.*

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) ......................................................................5
*Establishes evidentiary relevance of pattern conduct.*

Lewis v. Att'y Gen., 878 F.2d 714 (3d Cir. 1989) ................................................................5, 9
*Courts must treat all pro se filings as a whole.*

Alston v. Parker, 363 F.3d 229 (3d Cir. 2004) ........................................................5, 9
*Supports comprehensive review of pro se litigant's filings.*

Erickson v. Pardus, 551 U.S. 89 (2007) ...............................................................5, 9
*Supreme Court affirmation of liberal pro se standards.*

Haines v. Kerner, 404 U.S. 519 (1972) ................................................................5, 9
*Origin case for liberal construction of pro se pleadings.*

Texas Dept. of Housing v. Inclusive Communities Project, 576 U.S. 519 (2015)................5, 6, 9
*FHA disparate impact claims—neutral rules excluding protected groups are unlawful.*

Parker v. Shapiro, E.D.Pa., #24-02279 ...................................................................6
*Rejected a thirteenth-amendment right to avoid involuntary servitude by ending one's life. Also equal protection under MAID. Necessitates Plaintiff find housing to stay alive as required.*

Marsh v. Alabama, 326 U.S. 501, 506–07 (1946) ......................................................6,7
*Held that private property used for public functions is subject to constitutional limitations; used to support treating landlords as state actors.*

Jackson v. Metropolitan Edison Co., 419 U.S. 345, 352–53 (1974) .................................7
*Clarifies when a private actor is considered a state actor for constitutional purposes; supports the landlord-as-state-actor theory.*

Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982)..............................................8
*Distinguishes tester theory; cited to explain boundaries of FHA standing.*

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). .............................9
*Landmark case established standards for the admissibility of expert testimony; cited regarding the validity of tenant screening methodologies.*

## Statutes And Codes

**Fair Housing Act (FHA),** 42 U.S.C. §§ 3601 et seq...................................................1,2,3,4,5,6,11

**Renters' Access Act,** Philadelphia Code § 9-810...................................................2,3,6

**Article III – Constitutional Standing**...................................................................1,6

**Fifth Amendment**...........................................................................................4

**Fourteenth Amendment**.................................................................................4

**Federal Rule of Evidence – Expert Testimony,** Fed. R. Evid. 702 ...............................5

IN THE UNITED STATES COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER,**<br>Plaintiff<br><br>v.<br><br>Panphil Realty, LLC, et al.<br><br>Defendants | **Case No: 2:25-cv-01493-RBS** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR RECONSIDERATION OF ORDER DISMISSING CASE**

Plaintiff submits this Memorandum of Law in support of his motion for reconsideration of

this Court's dismissal without prejudice of May 19, 2025, and in support thereof, sets forth and

avers the following:

**INTRODUCTION**

Rather than focusing on the landlords alleged to have violated housing law, including open

code violations and credit discrimination under the Renters Access Act (RAA) and the Fair

Housing Act (FHA), the Court appears more concerned with portraying Plaintiff as a litigation

nuisance, inspired at least in part by internet defamation and hearsay. (Motion, p. 1, footnote 1)

This Court's dismissal order disregards or distorts controlling precedent[4] to such an extent

that it raises serious questions as to whether Plaintiff's claims were evaluated under the proper

---

[4] The Court's reliance on <u>Carney v. Adams</u>, 592 U.S. 53 (2020), to analogize Plaintiff's claims to those of a would-be judge is misplaced. <u>Carney</u> concerned access to a prestigious governmental office, implicating speculative reputational harm and political affiliation. ***Judicial appointees are also not expected to shell out five percent of their monthly income*** to apply for a job they were already told they would be rejected for. By contrast, Plaintiff's claims involve the loss of housing opportunities, a far more immediate and life-altering deprivation. As the Supreme Court has recognized, burdens on housing and residence directly implicate fundamental rights such as the right to travel, the right to establish domicile, and the right to safety and health. <u>See Saenz v. Roe</u>, 526 U.S. 489, 502–03 (1999); <u>Shapiro v. Thompson</u>, 394 U.S. 618, 629–30 (1969). Dismissing a housing access case under the same standing standard used for judicial appointments collapses critical distinctions between constitutional harm and political preference. Courts should not equate the loss of a political appointment with homelessness.

legal standard—particularly in light of his pro se status, which entitles him to liberal construction of pleadings and filings. Worse still, the statutory design of the FHA and RAA invites private enforcement by whistleblowers and private litigants, yet Plaintiff has been denied any statutory reward for doing precisely what those laws request. Denying recovery sends a signal to whistleblowers: don't bother.

Since standing was the sole basis for dismissal, Plaintiff notes that the Third Circuit will apply de novo review. See McTernan v. City of York, 577 F.3d 521, 526 (3d Cir. 2009). Given this Court's clear lack of neutrality—labeling Plaintiff a "serial pro se litigant" and *misstating his name in a manner consistent with doxing websites*—Plaintiff believes an amended complaint would further burden the Court and Defendants unnecessarily and chooses this more efficient path first as an alternative.[5]

In such an amended Complaint, Plaintiff would note that *discriminatory advertising causes a **direct** injury to Plaintiff by reducing his pool of available roommates, and in turn driving up the cost of low-budget hotels*.   Even without this, not all landlords are similarly situated; this Court can and should distinguish between defendants who operate within legal compliance and those who openly violate municipal law—particularly a civil rights statute like the Philadelphia Renters' Access Act.

Where landlords actively advertise minimum credit-score thresholds in defiance of local law, as these Defendants have, their conduct is presumptively unlawful. It is not speculative, and moreover, its impact on the pool of available roommates directly harms Plaintiff.  Defendants'

---

[5] Plaintiff can and will amend if he must. However, he respectfully submits that amendment should not be necessary, as his original Complaint (paragraph 22) and contemporaneous filings (motion for injunction, p. 1) already satisfied Article III standing requirements, including a credit score of 575, multiple disabilities (cancer and asthma), and the imminent need for relocation tied to the end-date of his current lease. This is sufficient to meet the injury-in-fact threshold under both the FHA and the Constitution.

credibility is materially impaired by their ongoing violations of the RAA, and the plausibility of futility is heightened. In contrast, landlords who maintain silent or case-by-case policies might merit a different analysis, but applying the same standard of assumed good faith or administrative discretion misreads the record and undermines judicial equity.

## II.   LEGAL STANDARD

### A.   Housing As A Constitutional Right

While housing is not (yet) a standalone constitutional right, precedent is moving that way.[6]

#### 1.   Constitutional Injury from Secondary Harm

While reputation alone is not a protected liberty interest, Paul v. Davis, 424 U.S. 693 (1976), held that reputational harm gives rise to a constitutional violation when it impairs a separately protected right.

#### 2.   Constitutional Interests in Housing and Travel

The right to interstate travel includes the right to establish residency and is protected by the Fifth and Fourteenth Amendments. Saenz v. Roe, 526 U.S. 489 (1999); Shapiro v. Thompson, 394 U.S. 618 (1969). When housing is denied through screening policies that functionally deter application—especially to the disabled—it implicates constitutional review under strict scrutiny. Dunn v. Blumstein, 405 U.S. 330 (1972).

---

[6] Housing's constitutional significance has steadily gained judicial acknowledgment, much like the early evolution of rap as a distinct genre—uncategorized at first, despite clear indicators of its individual influence and relevance. In the same way that "Eric B. Is President" (1986) signaled the maturation of rap into its own genre following several years of hit singles, the legal trajectory of housing rights reveals a movement toward independent constitutional recognition. The Supreme Court has affirmed that unjustified burdens on interstate movement and resettlement trigger heightened scrutiny under the Fifth and Fourteenth Amendments. See Saenz v. Roe, 526 U.S. 489, 502–503 (1999); Shapiro v. Thompson, 394 U.S. 618, 629–30 (1969). Because shelter is a prerequisite to these constitutional liberties, exclusionary practices in the rental market—particularly those disproportionately affecting vulnerable populations—must be scrutinized not merely under statutory frameworks, but also under constitutional standards.

### 3.    State Actor/Common Carrier Doctrine in the Housing Context

Landlords may be state actors (or common carriers) when exercising powers traditionally reserved to the government or operating within a regulatory system that delegates essential public functions. See Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982). In Philadelphia, rental housing is heavily regulated, and landlords function as gatekeepers to a constitutionally sensitive resource: housing. Accordingly, they are subject to constitutional constraints.

### B.    Standing and the Futility Doctrine

To establish standing, a plaintiff must show (1) injury-in-fact, (2) causation, and (3) redressability. Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992); Spokeo, Inc. v. Robins, 578 U.S. 330 (2016). The "futile gesture" doctrine, recognized in Teamsters v. United States, 431 U.S. 324 (1977), allows standing even without a formal application when a plaintiff is deterred by an explicit, discriminatory barrier. The Third Circuit reiterated this in Ellison v. Am. Bd. of Orthopaedic Surgery, 11 F.4th 200 (3d Cir. 2021), and Carney v. Adams, 592 U.S. 53 (2020), emphasizing that standing exists where one is "able and ready to apply" but deterred by policy.

### C.    Protected Activity and Retaliation under the FHA

42 U.S.C. § 3617 prohibits coercion, intimidation, and retaliation against individuals asserting their rights under the FHA. HUD regulations (24 C.F.R. § 100.400(c)(5)-(6)) affirm that even threats to file complaints are protected activity. The Eastern District has upheld that legal threats qualify. See Lloyd v. Presby's Inspired Life, 251 F. Supp. 3d 891 (E.D. Pa. 2017). Plaintiff's warnings to leasing agents, and Barsky's threatening response, clearly implicate this provision.

4

### D.    Credibility and Prior Bad Acts

When evaluating plausibility under Rule 12(b)(6), courts may assess credibility based on pattern conduct. Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). Defendants here have continued to post facially illegal credit-score requirements even after this suit was filed. That undermines their credibility and further supports Plaintiff's allegation that application would be futile. Courts are not required to accept hypothetical goodwill over established bad acts, nor would the refusal to do so disturb precedent.

Rather than focusing on landlords' egregious and ongoing violations of state and local law, in addition to having violated both local and federal housing law—including open code violations and facially discriminatory rental criteria—this Court appeared more concerned with portraying Plaintiff as a "serial pro se litigant." That mischaracterization, paired with the use of a defamatory variation of Plaintiff's name, reflects possible reliance on extrajudicial sources and raises serious impartiality concerns.  The dismissal also failed to apply controlling precedent regarding standing, constitutional harm, pro se pleading construction, and whistleblower enforcement incentives under the Fair Housing Act (FHA) and Philadelphia's Renters' Access Act (RAA). Since the decision turned on standing, the Third Circuit will apply *de novo* review.

### E.    Liberal Construction of Pro Se Pleadings

Pro se pleadings must be liberally construed. Haines v. Kerner, 404 U.S. 519 (1972); Erickson v. Pardus, 551 U.S. 89 (2007). Courts must read all filings together. Lewis v. Att'y Gen., 878 F.2d 714 (3d Cir. 1989); Alston v. Parker, 363 F.3d 229 (3d Cir. 2004).

### F.    Disparate Impact

The Fair Housing Act prohibits both intentional discrimination and facially neutral practices that have a **disparate impact** on protected groups. In Texas Dep't of Housing &

Comm. Affairs v. Inclusive Communities Project, 576 U.S. 519, 534–40 (2015), the Supreme Court affirmed that disparate impact claims are cognizable under the FHA. Such claims arise where policies, even if neutrally framed, disproportionately harm protected classes.

The Court specifically warned that "arbitrary, artificial, and unnecessary barriers" to housing access that harm protected classes, intentionally or otherwise, are prohibited. Id. at 543. Here, Plaintiff alleged precisely that: credit-score thresholds that predictably exclude disabled applicants, who are more likely to have lower credit scores for numerous reasons (debt, inability to work, etc.). These allegations fall squarely within the framework articulated in Texas.

## III.  ARGUMENT

### A.  Plaintiff's Allegations Establish Constitutional Harm

Plaintiff's allegations, grounded in medical necessity, disability, and proximity to emergency care, describe harm that is not abstract or ideological, but direct, particularized, and deeply tied to his capacity to exercise fundamental rights, and which is proximately caused by Defendants' credit-score requirements.

1.  **Paul v. Davis.**  Under Paul v. Davis, 424 U.S. 693, ***compound harm resulting in constitutional harm*** (such as lack of housing impeding the constitutional right to travel) requires strict judicial scrutiny. As Plaintiff is now medically required to stay alive, barriers to housing invoke constitutional concerns.  See Parker v. Shapiro, E.D.Pa., #24-02279.

2.  **Landlords As State Actors.**  Defendants are not mere passive property owners. They enforce policies derived from regulatory structures and act as public gatekeepers. Their refusal to amend or suspend their screening rules despite legal notice shows that they are ***acting under color of state law*** within the meaning of Marsh v. Alabama, 326 U.S. 501, 506–07 (1946).  Even

more telling is how all landlords work in concert with government to improve the supply of available housing.[7]

### 3. <u>Landlords As Common Carriers Of Housing</u>.

Even where private actors are not formal state actors, courts recognize heightened duties when private entities operate within extensive regulatory frameworks and control access to essential public functions. Landlords in urban rental markets—particularly in jurisdictions like Philadelphia—perform such a gatekeeping function, controlling access to shelter, an essential prerequisite to the exercise of fundamental rights.

While the traditional state actor doctrine remains governed by <u>Lugar</u>, courts also evaluate the nature of the function being performed. When private conduct is pervasively regulated, and when access affects constitutional rights (such as travel, medical safety, or due process), private landlords can be subject to constitutional constraints. See <u>Marsh</u> and <u>Jackson v. Metropolitan Edison Co.</u>, 419 U.S. 345, 352–53 (1974). This heightened scrutiny applies especially in cases where a) housing access is essential to life, liberty, or health; b) the private party performs a function historically public; c) the state delegates enforcement, licensing, or oversight to that private party;  and d) the party benefits from state protection (e.g., courts enforcing leases).

Thus, even if formal state actor status is disputed, a landlord's role in denying housing through exclusionary screening—especially under local regulation—warrants strict review.

---

[7]  Plaintiff acknowledges that landlords, particularly small property owners, provide an essential public service in maintaining the nation's housing stock. In Philadelphia, this deference is codified through programs like the Rental Improvement Fund (RIF), which offers forgivable and low-interest loans to small landlords for essential property repairs, aiming to preserve affordable housing. Such programs, while economically justified, underscore the degree to which small landlords function not merely as private market actors but as regulated agents in the housing delivery system—eligible for public funding yet, in practice, shielded from civil rights accountability.  When private actors perform a public function and are supported by state resources or protected by regulatory forbearance, their actions—particularly those involving access to shelter—must be subject to heightened scrutiny.  Deference to essential service providers is justified only so long as it does not become a systemic shield for misconduct.

**B.    Standing**

Plaintiff is not arguing standing as a tester; he cited Havens Realty Corp. v. Coleman, 455

U.S. 363 (1982) to support his claim of *futility*, by noting that applying for an apartment is not

always necessary.  Here, he asserts direct standing based both on futility and direct injury.

 **1.    Plaintiff Has Standing Based on Futility.**

  Plaintiff's 575 credit score is well below all Defendants' posted thresholds. That data,

confirmed in emails, was not softened or clarified. No Defendant invited him to apply or offered

accommodation. The futility doctrine permits standing where application would have been

fruitless. Teamsters; Ellison. This is not speculative—it is policy.

 **2.    Plaintiff Has Standing Based On Direct Injury.**

  Contrary to the Order dismissing this case, Plaintiff has suffered three distinct forms

of direct injury:

  **a.    Illegal Advertising Deters Plaintiff's Potential Roommates.**

  The "unidentified persons" and "general harm" cited in the Order of Dismissal

are not just a mere abstraction, but potential *roommates* of Plaintiff's who are undeniably

deterred by the illegal ads themselves, plus those who would also be denied by virtue of their

own low credit scores tied to their disability.

  **b.    Illegal Advertising Drives Up The Cost Of Low-Budget Housing.**

  The deterred potential roommates from subparagraph (a) above increase demand

pressure on a very limited low-budget housing supply, pushing the price of this housing option –

a clear last resort for Plaintiff and potential roommates, such as his brother – upward.

**c.    Disability and Harm Are Directly Tied to the Policy (And The Ad)**

The Supreme Court in <u>Texas Dep't of Housing</u>, 576 U.S. at 543, held that practices creating "artificial, arbitrary, and unnecessary barriers" to housing violate the FHA when they disproportionately exclude protected groups. Plaintiff has alleged that minimum credit score policies function in exactly this way. As a disabled individual with a documented score of 575, Plaintiff is statistically and personally impacted by a policy that serves no proven tenant safety or financial necessity justification.

Defendants have presented no evidence, <u>Daubert</u>-qualified or otherwise,[8] showing that 650+ credit score thresholds are narrowly tailored to a legitimate, non-discriminatory purpose. The policy is exclusionary in effect and unsupported in rationale—rendering it legally suspect under the disparate impact framework affirmed in <u>Texas</u>.

Defendants' facially neutral screening practices exclude individuals with medical debt or fixed incomes—commonly associated with disability. Plaintiff alleged he was deterred by such practices, and the Court's failure to connect disability to deterrence ignored binding FHA precedent. This was pleaded and shown across the record.

**D.    Plaintiff Engaged in Protected Activity and Was Retaliated Against**

Plaintiff warned leasing agents about discriminatory advertisements. That is protected activity. Defendant Barsky's "cease and desist" letter—misusing Rule 4.2 against a pro se litigant—was retaliatory under §3617.  Plaintiff also filed prior FHA claims, including PCHR complaints, against his clients. Barsky, as prior counsel in *Parker v. Lee*, was well aware of Plaintiff's protected status when he sent that e-mail.

---

[8] See <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).  Though not an issue at present, any future attempt to deny Plaintiff housing based on credit score or any "risk" should meet this standard, given its predictive nature and the licensing and regulation of those who are allowed to form such opinions for the public.

**E.    <u>Pro Se Status Requires Liberal Construction of Record</u>**

Plaintiff pled his disability and credit score in the original complaint and his medical urgency in his motion for preliminary injunction. The Court erred by isolating the amended complaint and ignoring the broader record. See <u>Lewis</u>, <u>Alston</u>, <u>Haines</u>.

**F.    <u>Ongoing Violations Undermine Credibility and Reinforce Futility</u>**

Post-filing, Defendants continued to advertise illegal credit requirements, suggesting no intention to comply or accommodate. That renders the Court's suggestion—that they *might* have waived their policy—factually implausible. Plaintiff proposes that violations of state and local law, particularly ongoing, create a presumption of futility.

### IV.    <u>CONCLUSION</u>

For the reasons set forth hereinabove, the instant motion for reconsideration should be granted.  An appropriate form of order is attached.

This the 27th day of May, 2025.

**Gordon Roy Parker, Pro Se**
315 South Broad Street, #0106
Philadelphia, PA  19107
gordonroyparker@gmail.com
(215) 951-4131

## IN THE UNITED STATES COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **GORDON ROY PARKER,** <br><br> Plaintiff <br><br> v. <br><br> Panphil Realty, LLC, et al. <br><br> Defendants | **Case No: 2:25-cv-01493-RBS** |

### <u>ORDER</u>

AND NOW, this ___th day of June, 2025, in consideration of **Plaintiff's Motion For Reconsideration Of Order Dismissing Case,** and all replies hereto, it is hereby ORDERED that the motion is **granted.**  The Amended Complaint shall be reinstated.  An Opinion and new scheduling order will follow.

_____
J.

### IN THE UNITED STATES COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **GORDON ROY PARKER,** <br><br> Plaintiff <br><br> v. <br><br> Panphil Realty, LLC, et al. <br><br> Defendants | **Case No: 2:25-cv-01493-RBS** |

## CERTIFICATE OF SERVICE

I, Gordon Roy Parker, **Plaintiff** in the above-styled action, hereby attest that I have

served **Plaintiff's Motion For Reconsideration Of Order Dismissing Case** by **hand delivery**

**or regular Mail** on the following:

Adam Barsky, Esq.
KBK Law Group
100 South Broad Street, # 1208
Philadelphia, PA  19102

PanPhil Realty, LLC
6822 Bustleton Avenue
Philadelphia, PA  19149

Nanxing "Nancy" Wei
Philadelphia Housing Development Corp.
1234 Market Street, 17th Floor
Philadelphia, PA  19107

*Attorney For Defendants:*
AMC Delancey
Greenzang Properties
New Horizons West
Brittney Knox
2045 Walnut Street Associates

Krista A. Rose, Esq.
Buchanan Ingersoll & Rooney, PC
Two Liberty Place
50 South 16th Street, Suite 3200
Philadelphia, PA  19102-2555
Attorney for Defendant Zillow

Courtesy copies are being sent to former parties.

This the 27th day of May, 2025.

**Gordon Roy Parker, Pro Se**
315 South Broad Street, #0106
Philadelphia, PA  19107
gordonroyparker@gmail.com
(215) 951-4131